WICKER, Judge.
This matter is before us on a remand from the Louisiana Supreme Court to determine whether a prescribed claim can be used as an offset. Dixie Building Materials Co., Inc. v. Bob L. Whittington & Associates, Inc., et al, 588 So.2d 78 (La.1991) (per curiam). The appeal arises from a judgment in favor of Dixie Building Materials, Inc. (Dixie), plaintiff/appellee, and against Kenneth Prieur, defendant/appellant, awarding $2,197.80, interest, and costs. The judgment in favor of Dixie was a recognition of payment due Dixie for concrete mix furnished to Bob L. Whitting-ton & Associates, Inc. (Whittington), Pri-eur’s sub-contractor. Prieur, the homeowner, hired Whittington to pour flat work, i.e. concrete, around a pool deck. Prieur reconvened asserting Dixie was a manufacturer of a defective product. The trial judge dismissed Prieur’s reconventional demand. In Dixie Building Materials Co., Inc. v. Bob L. Whittington & Associates, Inc. et al, 579 So.2d 999 (La.App. 5th Cir. 1991) we sustained the exception of prescription filed on behalf of Dixie. That judgment was reversed by the Supreme Court and the matter remanded as follows:
Prieur’s reconventional demand was based on the defectiveness of the concrete. His claim was prescribed by the one-year prescriptive period. Prieur’s re-conventional demand was not filed within 90 days of service of the main demand *715 under La.Code Civ.P. art. 1067. However, La. Code Civ.P. art. 424 allows a prescribed obligation to be used as a defense if it is incidental to, or connected with, the obligation sought to be enforced by the plaintiff. Plaintiffs (Dixie’s) claim is for payment for the concrete which Prieur in his reconventional demand claims was defective. Thus, Pri-eur’s claim is incidental to plaintiff’s demand and may be used as a defense.
Accordingly, we reverse the judgment of the court of appeal and remand the case to that court to determine whether Prieur’s prescribed claim can be used as an offset to the obligation plaintiff seeks to enforce.
Dixie Building Materials Co., Inc. v. Bob L. Whittington & Associates, et al, 588 So.2d 78 (La.1991) (per curiam).
We determine no offset is due and we affirm the judgment of the trial court.
The testimony at trial set forth the following.
Prieur testified he is the owner of the residence at 3720 Edenborn as well as the general contractor for the residence. He entered into a subcontract with Whitting-ton “for the pouring of the flat work around the pool deck.” He stated:
At the time that the concrete was being worked, was actually being screeted and floated and actually being washed, the problem that existed, that manifested itself was in attempting to expose the aggregate. The material was sloughing off and it was not being finished in a uniform fashion with the work — the finish work being flat and smooth and level. Greater amounts of the concrete surface were washing away and it was finishing in a manner that made it look like it had been worn and gouged, and it wouldn’t set up and it wouldn’t be — it wouldn’t allow itself to be finished as an exposed aggregate surface.
Prieur further testified Whittington told him (Prieur) that:
there was a problem with the mix. He said that the mix isn’t right and the concrete won’t set up and attempting — in the process of attempting to wash the top layer and expose the aggregate, the additional — too much of the concrete surface was washing away.
* * # * * *
Ultimately all the concrete had to be broken out and removed, repairs made to the deck, and it was re-poured.
Repairs to the plumbing, the brick enclosure as well as items in the pool enclosure were performed. Invoices and checks for these repairs were introduced into evidence.
Charles N. Kahn, Jr. testified he has been employed by Dixie for 13 to 14 years in quality control and production. He stated the “mix designs [were his] responsibility.” He was familiar with the account whereby Whittington ordered materials for a job at Prieur’s residence. Kahn stated Whittington ordered:
a six and a half sack pea pump. He was going to — and advised [t]hat he was going to have an exposed aggregate finish; in other words, the rocks would show, which is an entirely different design mix design from a six and half sack pea pump, which I advised Bob at the time that it wouldn’t work. [H]e claimed more than once that he had done it before successfully. I asked if it was with us, and I don’t remember the answer. I don’t think so. He said that he could pump the pea pump mix and he could make it into an exposed aggregate finish or a wash finish. The differences are in a pump mix there’s an excess of sand, in an exposed aggregate finish there would be an excess of rock. The excess of rock would be almost impossible to pump with the two inch pump that he used, and that’s what brought on all the discussion. I even asked him if he had ever tried to pump a wash finish, an exposed aggregate finish, and he said, yes, it was very difficult or almost impossible to pump, which I was sure of. That’s why I asked the question.
He was asked whether Whittington indicated he had done this successfully and was told:
*716 [h]e said he had pumped a pump mix and made an exposed aggregate finish out of it, seeding it. If you’ll notice by the invoice, he ordered bags of pea gravel to strew on the surface, it’s called seeding.
Kahn stated the “normal mix to use” was “a five and a half sack pea wash.” The mix Whittington ordered was prepared and delivered. Kahn stated Whittington explained he was going to pour the concrete mix as follows:
Well, the distance that the concrete had to be moved, the truck could not get to the spot where the concrete was to be placed. He was going to put his pump at the street, have our truck back up to it, and he was going to pump the concrete to the rear of the house to place the deck. The reason, it would be a considerable labor saving ... the concrete would have to get back there in another manner, and the easiest next solution would be wheelbarrows, which would require more people, more effort, and more time. The seeding process was discussed with Bob Whittington, and he said he had seeded concrete before to make an exposed aggregate finish, and I questioned him on that. I don’t — he says he had done it successfully. I did question him more than once on that, but he said it could be done.
Kahn testified Whittington “absolutely” insisted the material be mixed and delivered as ordered.
Kahn first became aware of Whitting-ton’s order when he overheard Dixie’s dispatcher take a call from Whittington. Kahn heard “pumpwash finish” and told the dispatcher he wanted to speak to whomever was on the telephone. Kahn told Whittington, “You can’t pump a wash finish.” Whittington told him, “Well, no, I wasn’t. I was going to pump a pump [sic] — a pea pump and seed it." Kahn admitted advising Whittington from the beginning that what he planned to do would not work. Kahn explained:
An exposed aggregate finish is an iffy thing. It’s a misnomer. An actual exposed aggregate finish should be done by a terrazzo person. A concrete finisher is not really equipped to do this, and Bob Whittington is a concrete finisher, and a fair to middle one. But when you are exposing the aggregate, it requires a lot of finesse. You have to — it’s an art rather than a craft, and I think Bob Whitting-ton is a craftsman, and this — if his timing was right it works out fine. If his timing is bad, it’s a terrible job, it’s a sloppy job.
Kahn was asked if it was “a possibility” the mix was not “up to specifications” and he said:
no. I think if it were, it wouldn’t have pumped. It is a two inch pump ... If it were not the proper cement content, which is the area you’re heading toward, whether you know it or not, it wouldn’t pump if it didn’t have the right amount of cement in it. He would need the cement to hold the rocks on the surface to make the seeding work.
There was no possibility the mix Dixie sent out was improper as it would not have pumped. He stated, “The pea pump pumped fine. A pea wash would not pump.” Whittington ordered a pea pump.
Kahn admitted knowing from the beginning that the mix would not serve its intended purpose. He stated he knew Whit-tington for 20 years and was trying to be helpful to him by explaining he didn’t think the mix would work. When Dixie redid the Prieur job the subcontractor on that occasion was Bob Gibbens and there were no problems.
Dewey Keller, Jr. testified he is Dixie’s President. He discussed the order with Whittington and told him the material would not work. As far as he knew the general contractor on the job was Whitting-ton since he ordered the materials. Whit-tington “insisted on that particular material” and “said he could do it.”
The trial judge concluded Dixie was not a manufacturer but only a supplier of raw materials and that it was Whittington’s negligence which caused Prieur’s damages.
On appeal Prieur specifies the following errors:
*717 1. The trial court erred in finding that the plaintiff was not a manufacturer, and
2. The trial judge erred in determining that the plaintiff did not owe a duty to Prieur under an implied warranty of fitness for its products.
In Moreno’s, Inc. v. Lake Charles Catholic H. Schs., Inc., 315 So.2d 660 (La.1975) a building owner was sued by a subcontractor for replacement of an air-conditioning compressor. The owner filed a third party demand in redhibition against the manufacturer of the original compressor which had failed after 2V2 years. The compressor had been designed to last 10 years. Suit was characterized as:
the assertion of a claim by the school against the manufacturer based upon an implied warranty owed by the manufacturer by virtue of the sale to [the subcontractor], a right to which the [building owner] is subrogated by law. La.Civil Code art. 2503.
Id. at 663.
The First Circuit followed the reasoning in Moreno’s, supra. Landry v. Baton Rouge Lumber Co., 434 So.2d 1144 (La. App. 1st Cir.1983). It allowed a building owner to be “subrogated to the rights of his contractor in redhibition against [a manufacturer].” Id. at 1146.
The Third Circuit has held:
Civil Code Article 2503 states, in pertinent part, that, “whether warranty be excluded or not the buyer shall become subrogated to the seller’s rights and actions in warranty against all others.” This language has been interpreted to mean that a consumer/purchaser without privity may recover against the original seller in redhibition for breach of warranty. Media Pro Consult, Inc. v. Mercedes-Benz of N.A., Inc., 262 La. 80, 262 So.2d 377 (1972), on remand, 264 So.2d 686 (La.App. 4th Cir.1972); Huffman-Euro Motors v. Physical Therapy, Etc., 373 So.2d 565 (La.App. 3rd Cir.1979); Landry v. Baton Rouge Lumber Co., 434 So.2d 1144 (La.App. 1st Cir.1983).
Theriot v. Commercial Union Ins. Co., 478 So.2d 741, 745 (La.App. 3rd Cir.1985).
We pretermit a discussion of whether Dixie is a manufacturer so that suit in redhibition would lie since there is no evidence the concrete mix was defective.
In Williams v. Louisiana Machinery Company, 387 So.2d 8 (La.App. 3rd Cir. 1980) a spindle and pinion assembly was installed in a diesel engine by a repairman for the company selling the assembly. The repairman installed an assembly which was too short. The new assembly was “useless for the purpose for which [it had been purchased.]” Id. at 11. The court held “plaintiffs remedy lies not in an action in redhibition, but in negligence [footnote omitted].” Id. The court explained at 11:
Plaintiff is correct in his assertion that the spindle and pinion assembly sold to him were useless for the purpose for which they were purchased. This uselessness, however, was not due to any vice or defect in the thing. “Vice or defect” as used in Article 2520 contemplated a physical imperfection or deformity; a lacking of a necessary component or level of quality. The thing plaintiff purchased was not defective within the contemplation of Article 2520. It was merely the wrong part. It was not capable of performing the function for which it was purchased, not because it was defective, but because it was the wrong part.
Similarly, the concrete mix was not defective but rather was not the type of mixture Whittington should have used to produce the results he intended.
The trial judge was correct in concluding it was Whittington’s negligence which caused the damage rather than a defect in the concrete mix. Those factual findings are amply supported by the evidence.
Appellant suggests in brief Dixie owed a duty to Prieur to inform him the product could not be used as intended. While we have serious reservations that such an action for negligence would lie under these circumstances, we nonetheless point out the trial judge specifically found Dixie to be free of negligence. That factual conclusion is supported by the record. Dixie informed Whittington of its opinion *718 the mix would not work as Whittington intended but Whittington insisted he had used that mixture successfully in the past. We find no manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
La.Civ.Code art. 2769 provides:
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
Accordingly, for the reasons stated, the judgment dismissing Prieur’s reconventional demand against Dixie is affirmed at Pri-eur’s cost.
AFFIRMED.